STATE of Missouri, Respondent,

v.

Brandon N. JUAREZ, Appellant.

No. WD 55980.

Missouri Court of Appeals, Western District.

July 11, 2000.

As Modified Aug. 29, 2000.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 29, 2000.

Application for Transfer Denied Oct. 3, 2000.

Sean D. O'Brien, Jeremy S. Weis, Miller Leonard, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for respondent.

Before Presiding Judge VICTOR C. HOWARD, Judge JOSEPH M. ELLIS and Judge LAURA DENVIR STITH.

LAURA DENVIR STITH, Judge.

Defendant–Appellant Brandon N. Juarez was convicted by a jury of one count of second-degree murder in violation of Section 565.021 and one count of armed criminal action in violation of Section 571.015. He received consecutive life sentences on each count. On appeal, Mr. Juarez requests reversal of both convictions based on the following allegations of trial court error: (1)(a) allowing the State to file additional charges against him in retaliation for moving to set aside his involuntary plea, and (b) failing to enforce the plea upon which he relied to his detriment; (2) relying on Defendant's withdrawn plea of guilty to justify imposing the maximum sentence; (3) depriving Defendant of the presumption of innocence by allowing the prosecutor to argue in his closing argument that Defendant had a strong incentive to lie; (4) failing to instruct the jury on involuntary manslaughter; (5) allowing the submission of instructions which erroneously based accomplice liability on acts committed after the offense and on merely "encouraging" the offense; (6) allowing the prosecutor to improperly comment on his right to remain silent by arguing that Defendant's failure to mention in his written and oral statements that he was "freaked out" by the murder cast doubt on the credibility of his later testimony at trial that the murder "freaked" him out; and (7) refusing to allow a duress defense to armed criminal action.

Because we find no merit to all but Defendant's last claim of error, we affirm his second-degree murder conviction and his life imprisonment on that count. We

reverse his conviction for armed criminal action, however, because we find that Section 562.071 unambiguously permits submission of duress as an affirmative defense to the crime of armed criminal action, and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

Viewed in the light most favorable to the verdict, the following facts were adduced at trial.[1] On the evening of September 14, 1995, Defendant and Paul Wayne Ham attended a party at the apartment of their friend, Robin Loveday. During the party, Defendant and Mr. Ham heard Ron Munsterman argue with and slap Ms. Loveday, who was Mr. Munsterman's girlfriend. This treatment of their friend, Ms. Loveday, upset Mr. Ham and Defendant, and Mr. Ham asked Defendant to help him beat up Mr. Munsterman.

Later that night, Defendant, Mr. Ham and Mr. Munsterman left the party in Mr. Munsterman's car and wound up at a local convenience store, where Mr. Munsterman purchased a 40–ounce bottle of beer. By this time, Defendant claims, he had dismissed the idea of beating up Mr. Munsterman. Nonetheless, while Mr. Munsterman was inside the store, Mr. Ham and he again discussed a plan to beat up Mr. Munsterman. Defendant and Mr. Ham lured Mr. Munsterman to a rock quarry outside town. After they drank some beer, Mr. Ham struck Mr. Munsterman over the head with a 40–ounce beer bottle and Defendant hit him in the jaw with two 12–ounce beer bottles. Mr. Ham then pulled out a knife and stabbed Mr. Munsterman in the stomach. When Mr. Munsterman fell to the ground, Mr. Ham stabbed him several times in the back and then handed the knife to Defendant.

According to Defendant's initial statement, at this point Mr. Munsterman looked up and asked "Why?" but Mr. Ham told Defendant he better stab Mr. Mun-

sterman too, threatening to kill him if he did not, so Defendant then stabbed the victim twice in the lower back or buttocks. According to Defendant's testimony at trial, Mr. Munsterman did not ask "Why?" until after Defendant had already stabbed him, and Defendant claimed that at the time Defendant had stabbed the victim he thought that the victim was already dead. In both versions of the story, Defendant said that Mr. Ham then took the knife back from him and cut Mr. Munsterman's throat and removed his pants and shoes. Defendant searched the pants and took the money and food stamps he found in them. Mr. Ham also cut Mr. Munsterman in the groin. Mr. Ham then dragged Mr. Munsterman's body to a nearby ravine and threw it over the edge, while Defendant got back into Mr. Munsterman's car so he could shine the headlights on the area to be sure nothing was left at the scene.

The two left the quarry in Mr. Munsterman's car, but Mr. Ham lost control of the vehicle and it got stuck in a ditch. They left the car and began to walk toward 71 Highway, in the direction of St. Joseph. As they walked, Mr. Ham wiped the knife used in the stabbing with a rag and threw the rag into a field. When they observed a police car stopped some distance in front of them on the road, Mr. Ham threw the knife into a ditch. They continued walking, and as they approached the police car, Andrew County Deputy Sheriff Tommy Hudson asked them what they were doing.

Defendant, who the deputy later testified did not appear frightened, nervous or upset, told the deputy that they were with a friend who, after an argument, kicked them out of his car, causing Defendant and Mr. Ham to have to walk back to St. Joseph. Both men identified themselves. Once Deputy Hudson found no warrants for arrest of either man, he gave them a ride back to St. Joseph and dropped them off at a convenience store. At the store, Defendant and Mr. Ham purchased some-

---

**1.** Further facts are set out in *Ham v. State,* 7

thing to eat with Mr. Munsterman's food stamps. They both eventually wound up back at Ms. Loveday's apartment, where they discussed what story to give police if they were questioned about the incident.

On September 15, 1995, Mr. Munsterman's car was found in the ditch where Defendant and Mr. Ham had left it. Approximately two months later, his body was located by a hunter. On November 30, 1995, Lt. Dennis Overbey of the Highway Patrol and Sgt. Brian Jamison went to Defendant's apartment to ask what he knew about Mr. Munsterman's murder. Defendant indicated that he did have knowledge of the murder and agreed to go with the police to the highway patrol office. Once there, Defendant told police that Mr. Ham called him earlier in the day to inform him that he had also been questioned by police and advised Defendant to put a girl into the story since he had already done so. Later, Defendant led the police to the knife, which he acknowledged he and Mr. Ham had used in the murder of Mr. Munsterman. He also took them to the quarry and showed police the broken beer bottles used to hit Mr. Munsterman. When they returned to the highway patrol office, Defendant agreed to give a statement.

Initially, Defendant was charged with a single count of first-degree murder. Pursuant to a negotiated plea of guilty, however, the charge was amended to second-degree murder, and he agreed to cooperate with police in the prosecution of co-defendant Paul Ham. After accepting this plea, the court sentenced Defendant to life imprisonment. For reasons discussed in detail below, Defendant was later permitted to withdraw the plea. The charges against him were amended, over his objection claiming prosecutorial vindictiveness, and the case proceeded to trial on counts of first-degree murder and armed criminal action. The jury convicted him of second-degree murder and armed criminal action and recommended sentences of life imprisonment on each count. The court sen-

tenced Defendant, in accordance with the jury's recommendation, to two life terms, and ordered the sentences to run consecutively. This appeal followed.

## II. ERRORS RELATING TO PLEA AGREEMENT

Defendant raises two claims of error regarding his withdrawal of his plea and the prosecutor's refusal to agree to another plea which was as beneficial as the plea that Defendant wrongly thought he was getting. He also objects to the court's grant of the prosecutor's subsequent motion to amend to charge him with armed criminal action, as well as first-degree murder, claiming that the amended charge was based on prosecutorial vindictiveness. A description of the background of plea negotiations is necessary to an understanding of these arguments.

After Defendant's arrest and prior to trial, Defendant and the prosecutor entered into plea negotiations. According to the prosecutor and defense counsel, the prosecutor believed the evidence supported a charge of murder in the first degree, and was considering also charging Defendant with armed criminal action. The prosecutor indicated that he was willing to accept a plea of guilty by Defendant to the lesser charge of murder in the second-degree, and would agree to a sentence of life imprisonment, in return for Defendant's cooperation and his sworn testimony in the State's case against Mr. Ham. On June 24, 1996, the State's original information charging Defendant with first-degree murder was amended to charge second-degree murder, and Defendant pleaded guilty to second-degree murder and agreed to testify against Mr. Ham as a part of that plea agreement.

The Court accepted the plea, and sentenced Defendant to life in prison. Under Section 558.019.4(1) RSMo 1994, a sentence of life imprisonment is considered, for purposes of parole, as a sentence of 30 years imprisonment. In negotiating the plea agreement, defense counsel, Tim

Warren, told Defendant that he would first be eligible for parole in 12 to 15 years. In fact, this was incorrect. Section 556.061(8), as in effect at the time of the plea, provided that a person convicted of a "dangerous felony" must serve a minimum of 85% of his or her sentence. In Defendant's case, since he was sentenced to life in prison, this meant that he could not be considered for parole until he had served 24 years in prison. Because this provision had only recently been enacted at the time that Defendant entered his guilty plea, neither Defendant, his attorney, nor the prosecutor were aware of the effect of Section 556.061.8 at the time that Defendant entered his guilty plea. Since defense counsel had thus affirmatively (if unintentionally) misled Defendant as to the date of his minimum parole eligibility, Defendant moved to be permitted to withdraw his plea. On May 2, 1997, the court granted Defendant's motion and he withdrew his plea.

After Defendant withdrew his guilty plea, the State moved to amend to again charge Defendant with first-degree murder and to add a charge of armed criminal action. Defendant opposed the amendment to add a charge of armed criminal action, asserting it was motivated by prosecutorial vindictiveness because the prosecutor was upset that he had been permitted to withdraw his guilty plea, but the court rejected this argument and permitted the amendment.

*A. Obligation to Offer Plea Comparable to Plea Defendant Wrongly Thought He was Getting.*

■ Defendant claims that the court should have required the prosecutor to offer him another plea agreement on terms comparable to those which he had wrongly thought he was getting, because he had partially performed the original plea agreement and relied on it to his detriment by agreeing to cooperate with the police and to testify against his co-defendant, Mr. Ham. Specifically, Defendant argues that, even though he was allowed to withdraw the plea before he testified against Mr. Ham, the very fact that he had agreed to so testify compromised his personal safety in prison, as he would thereafter be known and treated as a "snitch" in the penal system. Defendant claims that, despite having thus acted in reliance on the plea, he did not receive the benefit of the bargain for which he negotiated, since the State ultimately reinstated the first-degree murder charge and charged him with armed criminal action. He says that the only way to correct this "injustice" is to give him the benefit of the bargain he thought he was getting, by charging him with a crime which would permit him to be eligible for parole in 12 to 15 years, rather than in 24 years.

■ We reject this chain of reasoning for multiple reasons. First and foremost, it was *Defendant* who, after partially performing his obligations under the plea agreement, successfully sought to withdraw from the plea agreement. It was his choice to do so, and he was thereby freed from any other obligations he had yet to perform under the agreement. The fact that the State and the Defendant were in error as to the effect of the plea does not give him the right to the benefit of the bargain he thought he was getting, however. It only gives him the right to withdraw the plea. As the Eastern District of this Court noted in rejecting a similar argument:

> By moving to set aside his plea of guilty to the original charge . . ., appellant withdrew from his bargain. . . . He may not unilaterally withdraw from his part of the bargain and at the same time retain the benefit of the bargain. By setting aside his guilty plea, appellant unilaterally abrogated the agreement causing a reversion to the pre-plea bargain situation.

*Bolinger v. State,* 703 S.W.2d 25, 28 (Mo. App. E.D.1985).

■ Moreover, Defendant admits that the State was prohibited by statute from

offering Defendant the plea agreement he thought he was getting. That is, the relevant statutes required him to serve 85% of his sentence for second-degree murder. The prosecutor had no discretion to agree to a sentence not authorized by the statute, and had no authority to provide that he would be considered for parole sooner than permitted by statute. Thus, the prosecutor simply was without the power to offer Defendant the plea he thought he was getting. Specific performance of the plea was not possible.

Defendant recognizes that, for the reasons just stated, the State could not actually offer him the plea he thought he was getting, but suggests that it should have been required to offer to let him plead to another crime which carried the sentence he thought he was getting. Specifically, he suggests that the State could have just charged him with armed criminal action, and agreed upon a sentence of 30 years. Since this crime does not require that he serve a mandatory minimum of 85% of the sentence imposed, he would then be eligible for parole at the appropriate time.

██ Defendant cites no authority for the proposition that the State was required to offer him a new plea, and one equally as beneficial as the one he wrongly thought he had agreed to, merely because all parties were in error as to the effect of the initial plea, nor do we believe that the State had an obligation to find another crime for which the period of parole eligibility would be for the same period Defendant thought he agreed to in the plea, and offer to let him plead guilty to it instead of pleading guilty to second-degree murder. In the case of an involuntary plea such as this, his remedy is the right to withdraw his plea. He was permitted to do so here, but he and the prosecutor were unable to agree upon another plea, and he proceeded to trial. There is no unfairness in this sequence of events. And, while the trial court could have given further weight to Defendant's prior cooperation when determining Defendant's sentence after the jury

convicted him, the weight to be given to that cooperation was a matter for the trial court to determine in his discretion, and we do not find that there was an abuse of that discretion here.

*B. No Showing of Prosecutorial Vindictiveness.*

Defendant also asserts that the State amended the charges against him to include armed criminal action in retaliation for his success in moving to withdraw his guilty plea. In support, he notes that, on August 11, 1997, after he was permitted to withdraw his plea, the State moved to amend the charges against Defendant. It reinstated the charge of murder in the first degree and added a charge of armed criminal action. Defendant did not challenge the reinstatement of the first-degree murder charge, but he moved to dismiss the armed criminal action charge, alleging that the amendment was frivolous and was made only out of vindictiveness on the part of the prosecutor because the prosecutor was angry that Defendant was permitted to withdraw his plea. After a hearing, the court denied the motion and the case proceeded to trial. Defendant claims this was error, and that we should reverse his conviction of armed criminal action on this basis. We disagree.

██ Defendant is correct that a prosecutor is not permitted to increase the charges against a defendant out of vindictiveness, as a punishment or penalty for the defendant's assertion of a right granted him by law. *United States v. Goodwin,* 457 U.S. 368, 372, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982). It is also true, however, that a prosecutor "has broad discretion on the decision to prosecute and this decision is seldom subject to judicial review." *State v. Massey,* 763 S.W.2d 181, 182 (Mo. App. W.D.1988). And, as *Massey* notes:

Not all charges that can be filed against a defendant need be filed in the initial indictment. Prosecutors often hold some charges in abeyance, foreseeing their strategic uses in plea negotia-

tions. 'For just as a prosecutor may forgo legitimate charges already brought in an effort to save the time and expense of trial, a prosecutor may file additional charges if an initial expectation that a defendant would plead guilty to lesser charges proves unfounded.'

763 S.W.2d at 182, *quoting, United States v. Goodwin,* 457 U.S. at 380, 102 S.Ct. 2485.

In determining whether a prosecutor has brought an additional charge as a matter of prosecutorial discretion, based on the evidence, or whether the prosecutor has acted out of vindictiveness, the courts consider two factors: "(1) the prosecutor's stake in deterring the exercise of some right, and (2) the prosecutor's conduct." *Massey,* 763 S.W.2d at 183. The burden is initially on defendant to show that there is a realistic likelihood of vindictiveness. Only if this is shown does the burden shift to the prosecutor to show, by objective on-the-record explanations, the rationale for the State's actions. *Id.*

Here, the record shows no realistic likelihood that vindictiveness was the motivation for the prosecutor's decision to charge Defendant with armed criminal action once he withdrew his guilty plea. To the contrary, the record affirmatively shows that the prosecutor was considering bringing that charge before Defendant ever entered his guilty plea, and that part of the benefit he offered in return for the plea was an agreement not to bring the armed criminal action charge, and to lower the other charge from first-degree murder to second-degree murder. More specifically, during the hearing on Defendant's motion to dismiss the armed criminal action charge, Defendant's counsel during the plea negotiations testified:

Well, if, in fact, we did not proceed with a plea of murder in the second degree, I had been advised well before that date and Brandon and I spoke about it well before [the plea agreement, that] he would be charged with murder one, he would be charged with armed criminal action, and possibly other charges as well.

And part and parcel of our agreement was if he entered a plea of guilty to murder two, the agreement was no additional charges would be filed including the armed criminal action.

While Defendant presented countervailing evidence supporting his belief that the prosecutor acted out of vindictiveness, claiming that the prosecutor indicated that he filed the armed criminal action charge in an effort to extend the parole eligibility period beyond 24 years because of Defendant's filing of a frivolous motion to set aside the plea, the trial court was not required to believe this testimony, and the other evidence noted above supported a finding that the prosecutor did not charge Defendant with armed criminal action out of vindictiveness, but rather the prosecutor contemplated an armed criminal action charge prior to the plea agreement, and such a charge was fully supported by the evidence. Accordingly, the claim that the trial court erred in failing to find that the armed criminal action charge was based on prosecutorial vindictiveness is without merit.

## III. CONSIDERATION OF GUILTY PLEA STATEMENTS IN SENTENCING

Defendant also argues that it was error for the trial court, in sentencing Defendant after a jury determination of guilt, to consider the fact that Defendant had admitted his guilt at the time of his withdrawn plea. After hearing claims for leniency, the court stated:

Candidly, I cannot accept that all the blame for this offense be placed on Mr. Ham. I can't do that. *The jury found you guilty. You told me a couple of years ago that you were guilty.* The jury believed beyond a reasonable doubt that you were guilty of doing this and

you have to accept responsibility for this, perhaps you have, I don't know. (emphasis added).

■ First, we note that Defendant has failed to properly preserve this issue for review. His Point Relied On states only that his right to due process of law under the Fifth and Sixth Amendments to the United States Constitution and under Article 1, Sec. 10 of the Missouri Constitution was violated when "The trial court relied on statements made by appellant in connection with his involuntary plea to justify imposing the maximum sentence."

■ This is a good example of what cases applying Rule 30.06 label "an abstract statement of law." Rule 30.06(d). Since *Thummel v. King,* 570 S.W.2d 679, 685–86 (Mo. banc 1978), it has been clear that an abstract statement of law such as this is inadequate. Rather, the point must set out wherein and why the action of the trial court was wrong by relating the law to the facts of the particular case. *See, e.g., Warren v. State,* 2 S.W.3d 128, 130 (Mo.App. E.D.1999); *Finnical v. Finnical,* 992 S.W.2d 337, 342 (Mo.App. W.D.1999); *State v. Cardona–Rivera,* 975 S.W.2d 200, 203 (Mo.App. S.D.1998); *State v. Huckleberry,* 823 S.W.2d 82, 85 (Mo.App. W.D. 1991); *State v. Jones,* 786 S.W.2d 926, 927–28 (Mo.App. W.D.1990).[2] This point fails to do so. It says that it is a constitutional violation for the court to rely on these statements, but it does not say why it is so, or what statement was made.

When we turn to the argument portion of the brief, we further note that it does not explain why the judge's reference to Defendant's guilty plea is a violation of his constitutional due process rights. Defendant argues, rather, that this statement violates his rights under Rule 24.02(d)(5) and would violate the comparable federal rule. But, of course, violation of Rule 24.02(d)(5) is not mentioned in the Point Relied On.

In addition, the authority cited by Defendant does not support the argument that reversible error occurred in this case. The cited cases apply the principle set out in Rule 24.02(d)(5), which states in relevant part:

> [E]vidence of a plea of guilty, later withdrawn, . . . is not admissible in any civil or criminal proceeding against the person who made the plea or offer. . . .

*Id.* Clearly, Rule 24.02(d)(5) precludes use *at trial* of statements made by a defendant during a plea if that plea was withdrawn, for the plea has thereby been rendered involuntary and inadmissible as evidence of guilt. This rule has been applied in numerous cases. *See, e.g., State v. Hoopes,* 534 S.W.2d 26, 36 (Mo. banc 1976) (when a plea of guilty has been withdrawn by leave of the court, the *prosecutor* must not "afterwards use it against the defendant *at the trial*") (emphasis added); *State v. Abel,* 320 Mo. 445, 8 S.W.2d 55, 56 (1928) (same); *State v. Harper,* 855 S.W.2d 474, 477–78 (Mo.App. W.D.1993) (court found no error in the state's presenting *at trial* a witness who observed defendant plead guilty on previous occasions to other crimes as those were completed pleas); *State v. Price,* 787 S.W.2d 296, 299–300 (Mo.App. W.D.1990) (during negotiations the State was not satisfied with statements made by defendant and decided to withdraw it plea offer; since defendant pleaded guilty after knowing of the withdrawn offer, the plea was voluntary and intelligent); *State v. Danneman,* 708 S.W.2d 741, 743 (Mo.App. E.D.1986) (withdrawn plea cannot be used at a subsequent *trial*).

This is not the issue on which Defendant has asked us to rule in this case, however.

---

**2.** We note that, as revised effective in January 2000, a brief in a criminal case must follow the requirements of Rule 84.04(d). As revised in 1999, Rule 84.04(d) even more explicitly states the requirement of relating the law to the facts, for it requires each Point Relied On to identify the erroneous trial court ruling, state concisely the legal error, and then "explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error." Rule 84.04(d)(1).

The court did not admit evidence of Defendant's withdrawn plea in the jury trial. Rather, in pronouncing sentence, the judge noted that the jury found Defendant guilty and that Defendant himself had admitted his guilt during his plea two years earlier. Thus, the issue before us is not whether it would have been error to admit evidence of Defendant's withdrawn plea at trial, but whether it was reversible error for the judge to note the fact that Defendant had admitted his guilt at the hearing on his withdrawn guilty plea when *sentencing* defendant. Each of the cases Defendant cites deals with admission of evidence at trial; none of the cited cases concerns whether the fact that a defendant has previously admitted his guilt can be considered by the judge in a subsequent *sentencing* hearing after the plea is withdrawn. While it is permissible to cite cases dealing with an analogous point on appeal, defense counsel cites these cases as if they were directly on point and does not address whether and how they apply to a sentencing hearing. For all of these reasons, we find that the judge's alleged error in referring to Defendant's prior plea of guilty is not preserved for review. *Warren*, 2 S.W.3d at 130; *Huckleberry*, 823 S.W.2d at 85; *Jones*, 786 S.W.2d at 927–28.

We have nonetheless exercised our discretion to review for plain error, but have found none. Rule 30.20. Our own review of the law has not revealed any case which is directly on point, although analogous principles were discussed by our Supreme Court in addressing whether a psychiatrist who had examined the accused to determine competency could testify at the sentencing phase of defendant's trial in *State v. Copeland*, 928 S.W.2d 828, 839 (Mo. banc 1996). There, defendant was convicted of first-degree murder. During the penalty phase of her trial, she offered expert testimony showing that she was a battered spouse. In order to rebut this testimony, the State was permitted to introduce the testimony of the State's psychologist, Dr. Jacks, who was allowed to give his opinion, based on his prior mental examination of defendant, that she was not a battered spouse. Defense counsel objected that this violated her right against self-incrimination and violated Section 552.020.12, which stated in relevant part that:

> no statement made by the accused in the course of any examination or treatment pursuant to this section and no information received by any examiner or any other person in the course thereof ... shall be admitted in evidence against the accused on the issue of guilt in any criminal proceeding.

Sec. 552.020.12 RSMo 1994. Our Supreme Court rejected both arguments. In regard to the statute, it stated that "[h]ere, defendant's guilt had already been established when Dr. Jacks' testimony was presented.... The statute was not violated." *Copeland*, 928 S.W.2d at 839. In regard to the Fifth Amendment claim, the court found that, by claiming she was a battered spouse, she put her mental condition at issue and thus waived any claim that the testimony of experts who examined her was privileged. *Id.*

It is arguable that the same type of analysis applies here. That is, on its face, Rule 24.02(d)(5) does not directly prohibit consideration of the fact that Defendant had pleaded guilty. It says only that evidence of the plea or statements made during it shall not be *admissible* at any subsequent civil or criminal trial (with an exception not applicable here). Here, the judge did not admit evidence of the plea or of statements made at the plea. He made his comment at the sentencing hearing, by indicating that he was aware that Defendant had previously admitted his guilt when he pleaded guilty. Much evidence that is not admissible at trial may be included in a pre-sentence investigation report or otherwise be considered by the judge during sentencing. Defendant does not cite any authority stating that the judge's acknowledgement that he was aware that Defendant had previously

pleaded guilty was automatically prejudicial.

But, assuming that the court did err in considering the fact that Defendant admitted his guilt during his guilty plea, and, at any rate, believing that it would be better practice not to do so, we do not find that the error was prejudicial. First, every person who pleads guilty must admit his or her guilt and state a factual basis for the plea unless they make an *Alford* plea. *North Carolina v. Alford,* 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). The case record would clearly show that Defendant had made a plea and then withdrawn it. Thus, even if a different judge had been deciding Defendant's sentence than had presided over his withdrawn plea, that judge would have been aware that Defendant had admitted facts showing he was guilty of second-degree murder. Otherwise, his plea would never have been accepted in the first instance. That the judge openly acknowledged that he knew that Defendant had previously pleaded guilty, and that this necessarily means that he had admitted his guilt, should not require a remand for resentencing. Moreover, the sentence imposed by the court was that recommended by the jury, and the judge stressed the importance of the jury's finding of guilt. He mentioned Defendant's prior plea only in passing. We cannot find on this record that this comment had any effect on the judge's exercise of his discretion in sentencing Defendant. Point denied.

## IV. TELLING THE JURY DEFENDANT HAD AN INCENTIVE TO LIE TO SAVE HIMSELF DID NOT DENY HIM THE PRESUMPTION OF INNOCENCE

Defendant argues that he was denied the presumption of innocence when the prosecutor made the following statement in his closing argument:

And what did [Defendant] do with this golden opportunity? He lied. He can't even accept responsibility for that lie,

can he? Someone else did it, someone else did it. Aren't you tired of hearing that? *When you assess the credibility of this liar, don't leave your common sense behind when you go into that jury room. What greater bias or prejudice would he have in testifying that to save his own skin.*

(emphasis added). Specifically, Defendant claims that the jury was asked to draw a negative inference from the fact that Defendant had been charged, thereby negating his presumption of innocence, and that the trial court erred when it overruled his objection to this argument. We disagree. As noted by the State, the prosecutor may comment on the credibility of a defendant's case. *State v. Rhodes,* 988 S.W.2d 521, 527 (Mo. banc 1999). In doing so, he or she may "belittle and point to the improbability and untruthfulness of specific testimony" with considerable latitude. *State v. Weaver,* 912 S.W.2d 499, 513 (Mo. banc 1995).

In *State v. Henderson,* 530 S.W.2d 382, 384–85 (Mo.App. E.D.1975), defendant alleged a similar error. There, defendant claimed that, over counsel's objection, the court permitted the prosecutor to argue that all defendants who are charged with murder are on trial for their lives and, because of the gravity of the charge, will lie, for they are not concerned with the penalties for perjury. *Id.* Finding no prejudicial error, the court stated:

"Lifted out of context this argument appears much more likely to produce prejudice to the defendant than when viewed in the light of the evidence and the argument of both the defense and the prosecution.... Instruction No. 6—the credibility instruction—advised the jury that in determining the credibility and weight that it would give to the testimony of the witnesses it could take into consideration certain matters. Among those was the 'interest, if any' the witness had in the result of the trial. This argument, in our opinion, constitutes a reference to the fact that of all the wit-

nesses in the case it is the defendant who has the most to gain if his testimony is accepted by the jury; that, therefore, his credibility is subject to close scrutiny. While the argument could have been couched in more temperate terms and with less generalization, *the courts of this state have allowed prosecutors great latitude in final argument* and we conclude that while this line of argument comes close to the line, it does not, in the context in which it was made, constitute prejudicial error."

*Id.*(emphasis added). *See also State v. Francis*, 997 S.W.2d 74, 78 (Mo.App. W.D. 1999) (holding that defendants who chose to testify on their own behalf are subject to "contradiction and impeachment" as would be any other witness).

Just as in *Henderson*, the jury here was instructed that they may consider "any interest, bias, or prejudice the witness may have." Defendant chose to testify. It was therefore not erroneous for the prosecutor to ask the jury to closely scrutinize the credibility of Defendant, who clearly had an interest in the outcome of the trial. That is all the prosecutor did. He did not comment on the presumption of innocence, or suggest to the jury that Defendant was guilty merely because he had been charged. For these reasons, this point is denied.

## V. REFUSAL TO SUBMIT INVOLUNTARY MANSLAUGHTER WAS PROPER

In his third point, Defendant claims that the trial court erred in refusing to instruct the jury on the crime of involuntary manslaughter under MAI–CR 3rd 313.10 because, he asserts, Defendant's testimony as to how the crime occurred supported a jury finding that he had no intent to kill the victim and just killed him recklessly. We disagree.

While we resolve all doubts concerning whether to instruct the jury on a lesser-included charge in favor of giving the instruction, there must be some evidence to support the instruction before it will be given. *State v. Barnard*, 972 S.W.2d 462, 464 (Mo.App. W.D.1998). One is guilty of involuntary manslaughter if he or she "*recklessly* causes the death of another person." Sec. 565.024 RSMo.1994. Defendant argues that the evidence supported submission of the theory that he acted recklessly rather than intentionally when he killed Mr. Munsterman because "he believed Munsterman was already dead from at least eleven stab wounds inflicted by Paul Ham when appellant stabbed Munsterman in a non-vital part of his body."

The assertion that Defendant thought the victim was dead when he stabbed him was contrary to his statement in his confession to police before trial that the victim looked at Defendant and asked "Why?" just prior to being stabbed by Defendant, not after Defendant stabbed him. Even if the jury had believed Defendant's contrary testimony at trial, however, as the State notes in its brief, "While there may have been evidence from which the jury could have determined that appellant did not intend to kill Munsterman, there is no evidence to show that appellant acted recklessly."

That is, if the jury had believed Defendant's claim at trial that he thought the victim was dead when he stabbed him, and that Defendant stabbed the victim only in a non-vital area, that would not have provided a basis to convict him of involuntary manslaughter for recklessly killing the victim. For, if he stabbed him in a non-vital part, as he claimed, then his stabbing did not kill the victim at all. And, if the jury found he did in fact stab the victim in a vital area after all, and that he was wrong in believing it was non-vital, this would not entitle him to a manslaughter instruction either, for he still intended to stab the victim in the back, and "[a] testimonial denial of intent [to kill] may not authorize an instruction on manslaughter where a defendant's conduct was likely to produce

death." *State v. Coleman,* 949 S.W.2d 137, 144 (Mo.App. W.D.1997).

Moreover, even if the jury had believed that Defendant recklessly stabbed the victim himself, the case was submitted on the theory of accomplice liability. Defendant does not claim he could have recklessly agreed to lure the victim to the quarry and hit him on the head with two bottles, stab the victim, and then when the victim looked up at Defendant and asked "Why?", watch while his companion slit his throat and then help hide the body and cover up the crime, go into the victim's pockets, remove food stamps and money from them, and place the food stamps and the victim's pants in the car in an effort to hide what had occurred, and later spend some of the money and food stamps taken from the victim, all the while telling a cover story to police. In fact, until sometime in November, 1995, Defendant continued to live with Mr. Ham.

What Defendant is really trying to do is to negate his intent by arguing that he did not want to kill the victim, and that he stabbed and helped Mr. Ham kill the victim only because he was afraid that Mr. Ham would hurt him if he did not do so. This is thus a backhanded attempt to use a defense of duress, and to argue that his stabbing of the victim and other actions were at most a reckless act intended to avoid being hurt himself. Under Section 576.071.2(1) however, as discussed in more detail *infra,* duress is not a defense to murder. It also does not provide a basis for submission of involuntary manslaughter.

## VI. *ACCOMPLICE LIABILITY WAS PROPERLY SUBMITTED*

In Point IV, Defendant claims that, based on MAI–CR 3d 304.04, it was error for the court to submit instructions 5, 7, 9, and 11, as these instructions misstate the law because they allow the conviction of one who acts after the offense and allow one to be punished for merely "encourag-ing" the commission of the offense. We disagree.

■ Defendant failed to preserve this point for review because he failed to set out any of the allegedly erroneous instructions in his brief. At the time Defendant's initial brief was filed, Rule 30.06(e) stated: "If a point relates to the giving, refusal, or modification of an instruction such instruction shall be set forth in full in the argument portion of the brief." See 30.06(e), 84.04(e). Our Supreme Court has repeatedly held that failure to follow this requirement results in failure to preserve the alleged instructional error for review. *See, e.g., State v. Clayton,* 995 S.W.2d 468, 483 (Mo. banc 1999); *State v. Oxford,* 791 S.W.2d 396, 400 (Mo. banc 1990). We have nonetheless reviewed Instructions 5, 7, 9 and 11, which are set out in the Legal File, and find that only Instructions 5 and 7 refer to encouragement of another to commit a crime, and Instruction 5 submitted first-degree murder. As the jury acquitted Defendant of that charge, we assume that he does not want us to remand for a new trial due to error in its submission. We therefore turn our attention to Instruction 7, which defined accomplice liability in the course of submitting second-degree murder.

The introductory portion of Instruction No. 7, to which Defendant now objects on appeal, stated in relevant part:

A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with him with the common purpose of committing that offense, or if, for the purpose of committing that offense, he *aids or encourages* the other person in committing it.

(emphasis added by Defendant). Defendant argues that the instruction is inconsistent with the language of Section 562.041.1, which defines accomplice liability, because the instruction authorized the jury to find Defendant guilty as an accomplice of second-degree murder upon proof that he has merely *encouraged* another

person to commit the offense, whereas the statute requires proof that either before or during the offense he "aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." Sec. 562.041.1 RSMo.1994.

■ Unfortunately, Defendant failed to object to this aspect of Instruction 7 (or Instructions 5, 9, or 11) below. As we stated in *State v. Hill*, 970 S.W.2d 868 (Mo.App. W.D.1998):

> A defendant cannot stand idly by, permitting the giving of an erroneous instruction, and then benefit from his inaction. [*State v. Martindale*, 945 S.W.2d 669, 673 (Mo.App. E.D.1997) ]. The failure to object to an instruction constitutes a waiver of error. *Id.* "Instructional error rarely rises to the level of plain error."

*Id.* at 872; Rule 28.03. For these reasons, we review only for plain error under Rule 30.20.

■ We find no plain error here. Our Supreme Court has repeatedly rejected the argument that an instruction misstates the law if it allows conviction for "encouraging" the commission of the offense, holding that "encouraging the commission of a crime is one form of aiding in its commission." *Copeland*, 928 S.W.2d at 849. *Accord, State v. Barnum*, 14 S.W.3d 587, 591–92 (Mo. banc 2000). *State v. Richardson*, 923 S.W.2d 301, 317–18 (Mo. banc 1996), also considered an instruction similar to the one at bar, and upheld the use of the word "encouraged" in affirming defendant's conviction of second-degree murder based on accomplice liability. We find no error in use of the instruction here, either.

■ In the argument section of this point, although not in the Point Relied On, Defendant also claims that the instructions failed to require that the jury find that Defendant deliberated, and thus impermissibly lowered the State's burden in securing a conviction. First, we note that deliberation is only an element of first-degree murder, not of second-degree murder. Defendant was acquitted of first-degree murder. Thus, any error in submission of the first-degree murder instruction could not have prejudiced him. Second, while the first-degree murder instruction was not included in Defendant's brief in this Court, we have reviewed it in the Legal File, and it clearly does require a finding of deliberation.

■ Finally, Defendant claims that the instruction allows Defendant's conviction of the crime for acts committed after the offense. The language of the instruction, however, provides no support for Defendant's argument. Again, while the second-degree murder instruction was not included in the brief, our review of the instruction in the Legal File reveals that, in addition to defining accomplice liability, it reads as follows:

> A person is responsible for his own conduct and he is also responsible for the conduct of another person in committing an offense if he acts with him with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other person in committing it.

> As to Count I, if you do not find the defendant guilty of murder in the first degree, you must consider whether he is guilty of murder in the second degree. If you find and believe from the evidence beyond a reasonable doubt:

>> First, that on or about September 14, 1995, in the County Andrew, State of Missouri, the defendant caused the death of Ronald Munsterman by beating and stabbing him, and

>> Second, that the defendant was aware that his conduct was causing the death of Ronald Munsterman, or that it was the defendant's purpose to cause the death of Ronald Munsterman,

> then you are instructed that the offense of murder in the second degree has occurred, and if you further find and be-

lieve from the evidence beyond a reasonable doubt:

> Third, that with the ***purpose of promoting or furthering*** the commission of that murder in the second degree, the defendant acted together with Paul Ham ***in committing*** that offense,

then you will find the defendant guilty under Count I of murder in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the second degree.

If you do find the defendant guilty under Count I of murder in the second degree, you will assess and declare one of the following punishments:

1. Life imprisonment.

2. Imprisonment for a term of years fixed by you, but not less than ten years and not to exceed thirty years.

(emphasis added).

As is evident, paragraph third of this instruction specifically required the jury to find that, with the purpose of promoting or furthering the commission of that murder in the second degree, Defendant acted together with Paul Ham *in committing* that offense. Thus, it did not permit him to be convicted merely based on acts occurring after the offense. This point is denied.

## VII. COMMENT ON FAILURE TO OFFER EXCULPATORY DETAILS TO POLICE

■ Defendant asserts that it was error for the State to be permitted to argue in closing argument that Defendant's failure to tell the police that he was "freaking out" at the murder belied his claim at trial that the murder had this effect on him. He says that this permitted the jury to draw an adverse inference from his silence on an issue as to which he had not been asked for information.

■ Unfortunately, Defendant never refers us to the point in the record where the prosecutor made this allegedly improper remark, or where he objected to it. Because citations were not provided, we review only for plain error. Rule 30.06(h); Rule 30.20; *State v. Gleason,* 814 S.W.2d 310, 314 (Mo.App. S.D.1991); *State v. Roberts,* 948 S.W.2d 577, 592 (Mo. banc 1997). The State suggests that the comment to which Defendant objects occurred when the State noted that Defendant testified at trial that he was "freaking out" when the victim was being killed, but he did not tell this to police in either his oral or written statements when questioned. The prosecutor made this comment in his closing argument as follows:

PROSECUTOR: The defendant kept saying he wanted to go to the police and be accountable, but he has minimized his role at every opportunity. He is in denial. I guess the defendant forgot to tell Sergeant Jamison or write in his written statement that ***he was "freaking out."***

DEFENSE: Objection, Your Honor. May we approach?

THE COURT: Yes. (Counsel approached the bench, and the following proceedings were had:)

DEFENSE: Your Honor, under the Supreme Court decision State v. Stewart, 1972, it's a violation of the Fifth Amendment due process clause for the prosecutor to refer to defendant's silence as to a matter about which no question was asked, and I object.

THE COURT: Okay, Mr. Biggs, any response?

PROSECUTOR: Well, Your Honor, he's waived his Fifth Amendment right once he takes the stand.

THE COURT: All right. I'm going to overrule the objection; however, be

weary [sic] about what was and wasn't said in the statement. Okay? Thank you. The objection is overruled.

(emphasis added).

Defendant asserts that because the police did not question him about how he reacted to the murder when he first spoke with them, the State could not tell the jury about his silence on this issue, for this would violate his right to remain silent, citing *State v. Stuart*, 456 S.W.2d 19 (Mo. banc 1970). *Stuart* is clearly not on point, however, for the defendant in *Stuart* never waived his right to remain silent. For this reason, the prosecutor could not use his silence after his arrest against him. Here, by contrast, Defendant did choose to waive his right to remain silent, and voluntarily gave numerous statements to police. Where a defendant thus waives his Fifth Amendment rights, his post-arrest silence is admissible. *State v. White*, 941 S.W.2d 575, 580 (Mo.App. E.D.1997).

Defendant also cites *State v. Elmore*, 467 S.W.2d 915 (Mo. banc 1971), in which defendant chose to remain silent prior to trial but then testified at trial. *Elmore* found defendant's pre-trial silence could not be used against him at trial on these facts, although it found the admission of evidence of his silence was not plain error. *Id.* at 917. Here, however, Defendant gave both an oral and written statement to police, and testified at trial, thus waiving his right to remain silent both before and during trial. Accordingly, as *White* instructs, "[o]nce a defendant's right to remain silent has been waived … *[e]ven testimony describing certain "silence" is "fair subject for comment" at trial until the waiver is revoked."* *White*, 941 S.W.2d at 580. (emphasis added). It was not improper for the prosecutor to use Defendant's silence at the time of his statements on the issue of his alleged "freaking out" at the murder to rebut Defendant's argument that he wanted to go to the police and be accountable, but was afraid to. Point denied.

## VIII. ERROR IN REFUSING TO SUBMIT DURESS AS DEFENSE TO ARMED CRIMINAL ACTION CHARGE

Lastly, Defendant asserts that it was error for the trial court to refuse to submit duress as a defense to the armed criminal action charges submitted against him. The jury convicted Defendant of second-degree murder, and of armed criminal action based on his use of a deadly weapon in committing the murder. Defendant admits that Section 562.071.2(1) precludes submission of duress as a defense to murder. He argues, however, that it does not preclude submission of duress as a defense to armed criminal action, even where the underlying felony involved is murder, and therefore the court erred in refusing to submit that defense. Section 562.071 states:

1. It is an affirmative defense that the defendant engaged in the conduct charged to constitute an offense because he was coerced to do so, by the use of, or threatened imminent use of, unlawful physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist.

2. The defense of "duress" as defined in subsection 1 is not available:

(1) As to the crime of murder;

(2) As to any offense when the defendant recklessly places himself in a situation in which it is probable that he will be subjected to the force or threatened force described in subsection 1.

Sec. 562.071 RSMo 1994.

Both the State and Defendant concur that this is an issue of first impression in Missouri. While some cases have addressed the issue whether duress is a de-

fense to felony murder, and have held that it is not under Section 562.071.2(1), *see, e.g., State v. St. Clair*, 262 S.W.2d 25, 27 (Mo.1953); *State v. Lassen*, 679 S.W.2d 363 (Mo.App. S.D.1984), no cases have addressed whether it is a defense to armed criminal action where the weapon was used to commit first-degree or second-degree murder.

The State argues that we should find that Section 562.071.2(1) applies to prohibit submission of duress as a defense to armed criminal action because, since one cannot commit the crime of armed criminal action without committing the underlying felony, we should consider the underlying felony and the armed criminal action to be part of one and the same "transaction," and not allow duress to be submitted as to either, where, as here, the underlying felony is murder.

We disagree. As quoted above, Section 562.071 provides that duress *will be an affirmative defense* in any criminal case *except* "as to the crime of murder" or where defendant recklessly placed himself in a position where it was probable that he would be subjected to duress. The legislature clearly and distinctly stated that duress *shall* be a defense to all offenses except the crime of murder. Armed criminal action is not the equivalent of murder. Conviction of armed criminal action requires proof of an additional element to that required for the underlying crime, use of a deadly weapon, and it can be based on any felony, not just murder. Moreover, whatever felony it is based on, it carries a separate and distinct sentence. Therefore, the statute unambiguously permits submission of duress as an affirmative defense to the crime of armed criminal action, unless the exception set forth in subsection 562.071.2(2) applies. The State never argued or showed below that this exception applied, and does not so argue in this Court. In the absence of a finding that the latter exception applied, it was error to refuse to submit duress as a defense to armed criminal action. *State v. Stewart*, 832 S.W.2d 911 (Mo. banc 1992); *State v. Liffick*, 815 S.W.2d 132, 134 (Mo.App. E.D. 1991); *State v. Hornbeck*, 707 S.W.2d 809, 810 (Mo.App. E.D.1986).

We cannot say that this error was not prejudicial, for Defendant presented evidence which, if believed, would have shown that Mr. Ham threatened to harm or kill him if he did not stab the victim and otherwise participate in the murder. While our legislature has determined as a matter of policy that duress such as this will not justify the taking of another's life, it is not inconsistent for it to decide that such · duress will provide a defense to a claim that a defendant should be further punished for being forced to use a dangerous weapon in committing this offense.

For these reasons, we reject the claims of error raised by Defendant in Points I–VI, but we find that the court below erred in refusing to submit duress as an affirmative defense to armed criminal action. Accordingly, we affirm Defendant's conviction of second-degree murder and his sentence to life imprisonment on that count, but we reverse his conviction for armed criminal action and remand for further proceedings on that count consistent with this opinion.

Presiding Judge VICTOR C. HOWARD and Judge JOSEPH M. ELLIS, concur.