**STATE of Missouri, Respondent,**

v.

**Richard I. BUCHLI, II, Appellant.**

**No. WD 62178.**

Missouri Court of Appeals,
Western District.

Sept. 28, 2004.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 23, 2004.

Application for Transfer Denied
Jan. 25, 2005.

---

7. Igoe's motion for attorney's fees and costs is overruled.

Michael L. Belancio, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Deborah Daniels and Leslie E. McNamara, Office of Attorney General, Jefferson City, for Respondent.

PAUL M. SPINDEN, Judge.

A jury found that Richard I. Buchli II beat Richard Armitage to death in their law partnership office on May 5, 2000, in downtown Kansas City. The jury convicted Buchli of first-degree murder and armed criminal action. Buchli appeals on a number of grounds, including a challenge of the sufficiency of the state's evidence. We affirm the circuit court's judgment.

A legal assistant in the law office, Shannon Miller, apparently was the first to find Armitage after he was beaten. He was unconscious, lying on his office's floor in a pool of blood. She had decided to investigate when she heard unusual growling and gurgling emanating from Armitage's office. When she saw Armitage, she yelled for Buchli, who was in his office. Buchli took a few steps into Armitage's office and told her to telephone 911. While Miller was talking on the telephone to emergency personnel, Buchli pulled Armitage from behind his desk and dragged him across the floor. Buchli testified that he moved Armitage so he could assess his injuries and to make room to perform CPR, if needed. A brief time later, emergency personnel arrived and began administering aid to Armitage. When Buchli quit administering aid to Armitage, he had blood on his hands.

The emergency personnel transported Armitage to Truman Medical Center where he died two days later. Physicians concluded that the cause of death was nine or more blows to his head by a blunt object.

In investigating the incident, police determined that, at about 1:46 P.M. on the day of the incident, Armitage had received a long distance telephone call from a client with whom he had talked until 2:01 P.M. Miller had left for lunch a few minutes earlier. Buchli was in his office when she left. At about 2 P.M., an employee in an office on the floor directly below Armitage's and Buchli's offices heard two loud noises that occurred close together. The employee thought that the noises sounded like file cabinets tipping over.

Buchli left the building at approximately 2:06 P.M.,[1] got into his car in the building's

---

1. Three times, Buchli told police that he left the office at 1:50 P.M. An employee in the building testified that he saw Buchli walk out of the building at 2:10 P.M. The building's security surveillance videotape set the time at which Buchli walked out of the building to his

parking garage, and drove it away. He returned to the parking garage at approximately 2:30 P.M.[2] Buchli was smoking a cigarette on the building loading dock when Miller returned from lunch, and they walked together to the office. The office's front door was locked. Miller unlocked the door, and she and Buchli went to their desks. Miller found Armitage beaten in his office a few minutes later.

Blood experts analyzed the clothes that Buchli was wearing on the day of the beating and found impact blood spatters on them. An impact spatter can result from an object's hitting blood with force. Experts concluded from DNA testing that the blood on Buchli's clothes was Armitage's blood. The state's experts concluded that at least two events produced the bloodstains on Buchli's clothes and that they were consistent with Buchli's being in close proximity to the victim when the spatter was produced and with Buchli's being the attacker.

## Sufficiency of the Evidence

 Buchli contends that the state failed to produce sufficient evidence to support the jury's verdict that, beyond a reasonable doubt, he was the person who caused Armitage's death. In considering Buchli's point, we must consider the evidence most favorable to the state to be true, and we must disregard evidence to the contrary. *State v. Gilbert*, 103 S.W.3d 743, 749 (Mo. banc 2003). We do not reweigh the evidence or determine witnesses' credibility. *Rousan v. State*, 48 S.W.3d 576, 595 (Mo. banc 2001). We are

obligated to reject the challenge if we conclude that the state presented enough evidence to permit a juror to find, beyond a reasonable doubt, that the defendant was guilty. *Gilbert*, 103 S.W.3d at 749.

A person commits murder in the first degree if he "knowingly causes the death of another person after deliberation upon the matter." Section 565.020.1, RSMo 2000. Hence, the state's burden was to establish that Buchli caused Armitage's death by striking him, that Buchli was aware that his conduct was practically certain to cause Armitage's death, and that Buchli acted with deliberation.

In attacking the sufficiency of the state's evidence, Buchli first asserts that the time between when Armitage's telephone conversation ended and when Buchli walked out of the building to his car was not sufficient for him to have been the assailant. He argues:

> If Mr. Buchli [were] the assailant, the only way he could have committed the assault would have been to do so immediately after the telephone call ended. Under that scenario, Mr. Buchli had only four to nine minutes to beat his law partner nine times, ensure that there was no blood on his clothing, secrete the murder weapon in his briefcase (as argued by the state) without getting blood inside the briefcase ..., compose himself well enough to ride down [from the thirteenth floor] on the elevator, where he might meet other tenants of the building, casually walk through the

---

vehicle at 2:05:52 P.M. Twelve days after the attack, a police detective compared the time on his pager to the surveillance equipment. He discovered that the time on the surveillance equipment was three minutes behind the time on his pager. The detective, however, said that he did not know whether the time on his pager was accurate.

**2.** A building employee testified that he saw Buchli drive his vehicle into the parking garage at 2:28 P.M. The security surveillance videotape set the time of Buchli's return to the parking garage at 2:30:05 P.M.

parking lot to his Jeep, and then drive away without arousing suspicion.

There was no evidence to indicate how fast the elevators in the ... [b]uilding operate, but it is probable that no matter what time he left his office, Mr. Buchli spent at least a few minutes waiting for an elevator to arrive. This wait reduces that nine minute window of opportunity even further. Additionally, if Mr. Buchli had committed such a brutal attack on Mr. Armitage only minutes earlier, it would make sense that he would look at least somewhat flustered or in a hurry as he made his way to his car. Yet [a building employee] did not notice anything unusual about Mr. Buchli's appearance when he walked to his car[.] [The employee] did not even claim that Mr. Buchli drove out of the parking lot at a higher speed than normal. All of the evidence bearing on timing in this case indicates that there was no way Mr. Buchli could have committed the assault on Mr. Armitage within the four to nine minute window.

Buchli's argument has merit only if his getting to his car in four to nine minutes after beating Armitage was truly impossible. Buchli's own argument contradicts his assertion that "there was no way" for him to have beaten Armitage and still make it to his car within four to nine minutes without arousing suspicion. To the contrary, Buchli's own argument, by setting out the variables that had to fall into place for him to accomplish the feat, describes how it was possible. Even assuming that the feat would have been difficult, the jury had a reasonable basis for concluding that this is precisely what happened. That Buchli could have gotten to his car in four to nine minutes after the beating was not impossible, so, viewing the evidence in the light most favorable to the jury's verdict—as we are obligated to do—we cannot concur with Buchli that "there

was no way" for him to have been Armitage's attacker. From the state's evidence, the jury had a sufficient basis for inferring that the attack of Armitage occurred while Buchli was in the building.

Moreover, Buchli told police three times that he left the building at 1:50 P.M. The surveillance videotape established that he did not leave the building until 2:05:52 P.M. " 'Exculpatory statements, when proven false, evidence a consciousness of guilt[.]' " *State v. Clay*, 975 S.W.2d 121, 140 (Mo. banc 1998), *cert. denied*, 525 U.S. 1085, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999) (citation omitted). "Guilt may be inferred when an accused attempts to deceive the police, as in making a false exculpatory statement." *State v. Hibbert*, 14 S.W.3d 249, 253 (Mo.App.2000).

The jury also had substantial evidence from which it could conclude reasonably that Buchli had Armitage's blood on his clothes and shoes and that this was consistent with Buchli's being the attacker. Buchli, however, attacks this evidence by contending that the jury could not rely on it because the state's experts did not give opinions based on a reasonable degree of scientific certainty.

The rules regarding expert testimony are the same in criminal cases as they are in civil cases. *State v. Maxie*, 513 S.W.2d 338, 344 (Mo.1974), *cert. denied*, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402. The state's experts based their conclusions on their training and experience in the field of blood analysis. An expert's not speaking the precise phrase, "within a reasonable degree of scientific certainty," does not render his or her testimony inadmissible if the expert's testimony establishes that his or her opinion was based on reasonable certainty and not on speculation. *Bynote v. National Super Markets, Inc.*, 891 S.W.2d 117, 125 (Mo. banc 1995).

Buchli asserts, however, that " '[w]hen a party relies on expert testimony to provide evidence as to causation when there are two or more possible causes, that testimony must be given to a reasonable degree of certainty.' " *Abbott v. Haga,* 77 S.W.3d 728, 732 (Mo.App.2002) (citation omitted). But the *Abbott* court concluded only that an expert's using "equivocal language" would render his or her opinion inadmissible. *Id.* at 733.

Buchli contends that the experts' testimonies established at least two possible causes for the blood spatter on his clothing. The state's experts concluded that the bloodstain evidence was consistent with Buchli's being the attacker, and Buchli's experts concluded that the evidence was inconsistent with Buchli's being the attacker but was consistent with blood spatters produced by clapping. Indeed, Miller testified that, while she was on the telephone talking to emergency personnel, she heard Buchli yelling Armitage's name and two sets of handclaps.[3] Although the state's experts agreed that handclapping could cause blood spatters, both opined that handclapping did not cause the spatters on Buchli's clothes and shoes.

State expert Stuart James testified that he based his conclusions and opinions on his experience and examination of the evidence in this case. Although he opined that handclapping was capable of producing blood spatter, he concluded that it was "a vague possibility" in this case. When asked whether or not he could state with a reasonable degree of scientific certainty that handclapping caused the bloodstains on Buchli's clothes and shoes, he said, "Not as a single event. [W]hen you add the shoes, that fits with the beating situa-

tion as well, or additional events that cannot be accounted for by just clapping in one location.... You've got to clap in the right places at the right time."[4]

The state's other expert, Linda Netzel, testified that, based on the totality of the case, she could rule out handclapping as the cause for the bloodstains on Buchli's clothes and shoes. She opined, "[B]ecause we had multiple events occurring, we had two events on the shoes, another event on the shirt, and the events on the shoes to me, physically you could not produce this spatter doing clapping."

Neither James nor Netzel used equivocal language in expressing their opinions. Both concluded that the blood spatter on Buchli's clothes and shoes was consistent with Buchli's being in close proximity to the victim when the spatter was produced and was consistent with Buchli's being the attacker, and both concluded that handclapping did not cause the blood spatter as a single event in this case.

Buchli further asserts that insufficient evidence existed to show deliberation. "Deliberation" is a "cool reflection for any length of time no matter how brief." Section 565.002(3), RSMo 2000. Proof of deliberation does not require a showing that the defendant contemplated his actions for a long period of time, and the fact-finder may infer it from the circumstances surrounding the crime. *State v. Ervin,* 979 S.W.2d 149, 159 (Mo. banc 1998), *cert. denied,* 525 U.S. 1169, 119 S.Ct. 1090, 143 L.Ed.2d 91 (1999). Deliberation may be properly inferred where the defendant had ample opportunity to terminate the crime, where the victim sustained multiple wounds or repeated blows, or where

---

3. The claps were audible on the audio recording of the 911 call.

4. Buchli's expert, Terry Laber, disagreed. He concluded that a single event and handclapping from the same location could have caused the blood spatter.

the defendant and victim were involved in a prolonged struggle. *Id.* The evidence established that Armitage was beaten several times in the head with a blunt object and that the beating began in one part of the office and moved to another part. Such evidence shows repeated blows and multiple injuries to Armitage and indicates a struggle. From this evidence, the jury was reasonable in concluding that Buchli deliberated.

Viewing the evidence in the light most favorable to the verdict, we conclude that the state presented sufficient evidence from which a jury could find Buchli guilty beyond a reasonable doubt of murder in the first degree.[5] Buchli's contention is without merit.

### Rebuttal Testimony

■ In his next point, Buchli contends that the circuit court erred in permitting John Wilson to testify in rebuttal about tests that he performed on carpeting that had been analyzed by defense experts. Buchli assets that Wilson's testimony was improper because (1) the state did not show a chain-of-custody for the carpet, (2) the evidence was not proper rebuttal, and (3) the state violated discovery rules by not disclosing the tests performed by Wilson prior to trial. We disagree.

Armitage bled profusely onto his office's carpet. The day after the beating, acting in accord with police instructions, the building's manager hired a company to clean Armitage's office. When the company's personnel could not clean bloodstains from the carpet, they removed the carpet, placed it in a plastic bag, and took it to a dump. Police later recovered a bag with carpeting from the dump and stored it at the Regional Crime Lab.

At trial, defense expert Terry Laber testified that he had examined the carpet from Armitage's office. The prosecuting attorney cross-examined him:

Q. [D]id you see any impact spatter on that carpet?

A. By the time I looked at the carpeting in this particular area, because of the bloodstaining and blood trails[,] I could not say whether there was spatter there or not at any one time. I couldn't pick out individual spatters there.

Q. Did you attempt to do that?

A. I looked at areas there, and I looked around here for spatter. I looked around in this area for a void—

Q. Mr. Laber, I'm going to stop you a second. I'm still in this area back here around the general area where it says 11.

Did you look at the carpet in that area?

A. Yes.

Q. And you said you were unable to see any impact spatter on that carpet; is that what you just said?

A. I was unable to see whether there was impact spatter there or not because of the condition of the carpet.

Q. Did you notice any?

A. No. It was all smeared.

Q. I'm talking on either side of that. Did you notice anything there?

A. No.

Q. Did you use a microscope or attempt magnification to try to identify bloodstains in that area in terms of spatter?

A. I used a magnifying light source. I'm not sure that I used a[—]I mean the

**5.** To the extent that Buchli complains that the state's evidence was insufficient to establish a financial motive for him to kill Armitage, mo-

tive is not an element of first-degree murder. State v. Petty, 967 S.W.2d 127, 139 (Mo.App. 1998).

high-power microscope that we have[—]you couldn't get the carpeting under that.

Q. Are you telling us we don't know whether there is spatter in this area or not?

A. I'd say, I don't know if there is spatter in that area because of the nature of the carpeting.

Q. Moving over here around this area that is just to the east of the pool of blood on the diagram, did you see any blood spatter on the carpet in this area?

A. Again, I couldn't see any spatter.

Q. And again, did you attempt to look?

A. Yes.

Q. And you tried to identify it and you couldn't?

A. Yes.

Q. Does that mean that you were unable to or you did not see any? I want to be clear on this.

A. Based on the carpeting, just whether there was spatter there or not.

Q. So that's inconclusive?

A. Whether there was spatter or not is inconclusive.

. . . .

Q. [Y]ou didn't look at the carpet in such a way that you could note whether there was spatter there[;] is that right?

A. No, I did look at the carpet; because of the condition of the carpet I couldn't tell whether there was spatter there or . . . not.

. . . .

Q. At the time that you examined it were you aware that some cleaning has been done to the carpet before it had been taken? That's my question.

A. No.

To rebut Laber's testimony, the prosecuting attorney called John Wilson, chief criminalist in charge of the Trace Evidence Section of the Kansas City Police Crime Laboratory, to testify about his examination of the carpet. Wilson testified that he examined the same carpet that Laber had examined, and he found 71 small blood spatters and four larger blood spatters on the carpet.

Buchli asserts that the circuit court erred in admitting Wilson's testimony because the prosecuting attorney did not establish that the carpet was in the same condition when Wilson examined it as it was at the crime scene. Buchli claims that, because the carpeting had been subjected to some sort of cleaning process, had been removed from Armitage's office, and had been sent to a dump, the prosecuting attorney did not provide a reasonable assurance that the carpet had not been tampered with or contaminated.

Wilson's testimony, however, was rebuttal to the defense expert's testimony regarding the carpet. Buchli's expert, Laber, had testified concerning his findings from examining the carpet after it was taken from the crime scene. Wilson testified that he retrieved the carpet from the freezer in the lab and gave it to Laber. He said that the container holding the carpet was sealed when he gave it to Laber and that, when Laber finished examining the carpet, Laber resealed the bag and gave it back to Wilson. A week later, Wilson retrieved the same container that had been resealed by Laber and examined the same carpet inside the container that Laber had examined. Any deficiencies in the evidence as to whether the carpet was the actual carpet taken from the crime scene or whether it had been altered from its original state was brought about by the defense's introduction of Laber's testimony that he examined the carpeting and his identification of the carpet as that which was taken from the crime scene. "A de-

fendant may not ... complain about matters he himself brings into the case." *State v. Kelly*, 689 S.W.2d 639, 640 (Mo. App.1985).

■ Buchli also asserts that Wilson's testimony was improper rebuttal because it was scientific or expert testimony and that the prosecuting attorney should have presented it in her case-in-chief. To the contrary, " '[a]ny competent testimony that tends to explain, counteract, repel or disprove evidence offered by defendant may be offered in rebuttal of the defendant's testimony or evidence.' " *State v. Gardner*, 8 S.W.3d 66, 72 (Mo. banc 1999) (quoting *State v. Peterson*, 518 S.W.2d 1, 3 (Mo. 1974)). This would include expert testimony. The prosecuting attorney offered Wilson's rebuttal testimony to counteract and to disprove Laber's testimony that blood spatter could not be found in the carpet.[6] We find no abuse of discretion.

Buchli also asserts that the circuit court should not have allowed Wilson's testimony because the prosecuting attorney did not disclose the results of Wilson's testing on the carpet before trial as required by Rule 25.03.[7] We disagree.

■ Because Wilson was a rebuttal witness, the state had no obligation to announce to the defense that he was a witness. *State v. Menteer*, 845 S.W.2d 581, 586 (Mo.App.1992) ("Generally, there is no obligation to disclose rebuttal witnesses, unless they are called to rebut an alibi."); *State v. Cook*, 5 S.W.3d 572, 576 (Mo.App.1999), *cert. denied*, 531 U.S. 943, 121 S.Ct. 339, 148 L.Ed.2d 272 (2000) (state must "identify a rebuttal witness before calling him or her at trial if the defendant relies on the defense of mental disease or defect[.]"). Moreover, " 'whether a witness may be a proper rebuttal witness is determined by the [circuit] court without regard to Rule 25.03.' " *State v. Moody*, 645 S.W.2d 152, 157 (Mo.App.1982) (citation omitted).

■ To the extent that Buchli contends that the prosecuting attorney did not disclose the results of Wilson's tests on the carpet, the record does not establish that the state did, in fact, possess any document, as described in Rule 25.03(A)(5), containing the opinions by Wilson about which Buchli complains. *See State v. Enke*, 891 S.W.2d 134, 137–38 (Mo.App. 1994). "Rule 25.03 requires the state to disclose ... existing written statements or memoranda but it does not require a summarization of a witness' testimony." *Id.* at 138. Although *State v. Kehner*, 776 S.W.2d 396, 398 (Mo.App.1989), suggests that the state must disclose rebuttal evidence, if requested, under Rule 25.03, Wilson did not have "[a]ny reports or statements, ... made in connection with the

---

**6.** To the extent that Buchli relies on *Gassen v. Woy*, 785 S.W.2d 601, 605 (Mo.App.1990), for support of his contention that scientific or expert testimony is not proper rebuttal, we are not persuaded. The *Gassen* court simply said that "[a] party cannot, as a matter of right, offer in rebuttal evidence which was proper or should have been introduced in chief[.]" *Id.* That the state could have presented the challenged evidence in its case in chief does not preclude its being offered in rebuttal. " 'It is within the [circuit] court's broad discretion to allow evidence in chief to be introduced in rebuttal.' " *State v. Cameron*, 604 S.W.2d 653, 657–58 (Mo.App.1980) (citation omitted).

**7.** Rule 25.03 says, "(A) Except as otherwise provided in these Rules as to protective orders, the state shall, upon written request of defendant's counsel, disclose to defendant's counsel such part or all of the following material and information within its possession or control designated in said request: ... (5) Any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons[.]"

particular case, including results of … scientific tests, experiments, or comparisons[.]" The circuit court, therefore, did not abuse its discretion in permitting Wilson to testify in rebuttal about tests he performed on the carpet.

### Closing Argument

■■■ In his next point, Buchli asserts that the circuit court erred in overruling his objections to the state's improper closing arguments. He contends that the circuit court allowed the prosecuting attorney on rebuttal to redefine MAI–Cr3d 302.06 regarding "reasonable inferences" by encouraging the jury to "speculate and guess" as to the evidence and allowed the state to argue on rebuttal matters outside the evidence, implying that Buchli had committed other unknown and uncharged bad acts.

During the state's rebuttal closing, the prosecuting attorney argued:

> [T]his is the first instruction that you have in the case. Let me pick out something here that we're going to talk about right now before we get any further. Right here, "It is your duty to determine the facts and determine them only from the evidence and the reasonable inferences to be drawn from the evidence." That's your job.
>
> And [Buchli's attorney] gets up here and tries to mislead you by saying you can't guess, you can't speculate—
>
> [BUCHLI'S ATTORNEY]: Judge, I object to personalization.
>
> THE COURT: Yeah.
>
> [PROSECUTING ATTORNEY]: I'm merely stating what he said in closing arguments, Your Honor[;] I'm not personalizing.
>
> [THE COURT]: Well—
>
> [BUCHLI'S ATTORNEY]: Saying I misled the jury is wrong.

> THE COURT: If that's what you're doing, overruled.
>
> [PROSECUTING ATTORNEY]: He said to you, you cannot guess, cannot speculate. Well, you know what? That's part of your job. Speculation is the same as drawing a reasonable inference from what you've heard.
>
> You can't answer every single question in this case. There are questions we don't have answers to. And you do have to sit down and figure out what happened. You can speculate about the motive, there is nothing wrong with that.

Although Buchli objected in part to the argument, he did not object on the ground that it was inconsistent with the court's instructions and the law. Buchli's only objection at trial was that the prosecutor was improperly personalizing the argument; hence, he did not preserve the issue for review and is entitled, if at all, to plain error review only.

■■■ Rarely should an appellate court grant relief on assertions of plain error in closing argument. *State v. Clemmons,* 753 S.W.2d 901, 907 (Mo. banc), *cert. denied,* 488 U.S. 948, 109 S.Ct. 380, 102 L.Ed.2d 369 (1988). "This is because, in the absence of objection and request for relief, the [circuit] court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention." *Id.* at 907–08. The Supreme Court has instructed:

> [T]he absence of an objection is fatal to the defendant's contention [that the circuit court should have intervened, *sua sponte,* when a prosecutor makes an improper argument]. Had objection been made the trial judge could have taken appropriate steps to make correction. The defendant was not necessarily entitled to a mistrial. The judge could consider the state of the evidence and the apparent effect on the jury and might

conclude that it would be sufficient to sustain the objection and then caution the jury if requested. Defense counsel did not give him this chance.

*State v. Kempker,* 824 S.W.2d 909, 911 (Mo. banc 1992). We find no basis for plain error review of this point. Indeed, we presume that the jury knew and followed the court's instructions regarding reasonable doubt and reasonable inferences. *State v. Madison,* 997 S.W.2d 16, 21 (Mo. banc 1999). Moreover, although the prosecutor's argument that "[s]peculation is the same as drawing a reasonable inference" was erroneous, taking the argument in context, she told the jury only that it could speculate on Buchli's motive, which was not an element of the charged offense. *See State v. Spidle,* 967 S.W.2d 289, 293 (Mo.App.1998) (no plain error as a result of the state's comments to the venire panel suggesting that it need not find all of the facts beyond a reasonable doubt but only find the elements of the crime beyond a reasonable doubt).

Buchli also contends that the circuit court abused its discretion in allowing the prosecuting attorney to argue on rebuttal matters outside the evidence by implying that Buchli had committed other, unknown and uncharged bad acts. During the closing argument on rebuttal, the prosecutor argued that Buchli lied to the Internal Revenue Service in reporting his income. Buchli objected, and the circuit court sustained the objection and instructed the jury to disregard the comment. The prosecutor then reminded the jury of evidence that indicated that in 1998, 1999, and 2000, Buchli had significantly more deposits going into his account than he claimed as income on his income tax returns. She said, "He's misrepresenting what his income is or he's stealing the money." Buchli objected, but the circuit court overruled the objection. The prosecutor continued:

You can look at the income tax forms[;] you can see what he filed in terms of expenses and deductions ... he's putting income down that is low compared to what is going into his personal account. Where is that money coming from? We don't know. But he's misrepresenting about what he's having in income or else he's getting money from some illegal source that's going into his bank account.

Buchli objected, asserting that it was improper argument because the evidence did not support the prosecutor's contention, and the circuit court sustained the objection. The prosecutor then continued her rebuttal argument:

And going back to the motive and the money being the framework, ladies and gentlemen, you know something happened. Did Richard Armitage find him taking money from the trust account? We don't know. Did he catch him in some impropriety that he could report to the Bar—

[BUCHLI'S ATTORNEY]: Your Honor, this is just so outside the evidence and it's so improper. There's no evidence to support that.

[PROSECUTING ATTORNEY]: Your Honor, it's argument and it's rational.

[BUCHLI'S ATTORNEY]: It's not proper argument.

THE COURT: Well, overruled.

[PROSECUTING ATTORNEY]: Ladies and gentlemen, something happened. Could have been that he caught him in some impropriety, something that would have challenged his very method of making money, his very existence.

What if he knew something [and] he said[,] "I'm going to report you," or what if he said[,] "I'm not going to practice with you anymore[.] I'm tired of

supporting you[.] I'm not going to continue the lease when it's up next year."

Something happened to make this man go out and make a decision to take Richard Armitage's life.

■ To the extent that Buchli contends that the prosecutor's arguments about Buchli's lying to the IRS and about his getting the money from an illegal source were improper, the circuit court sustained Buchli's objections to those arguments. Buchli requested no other corrective action. He received the relief he requested and cannot now complain of error. *State v. White*, 835 S.W.2d 942, 952 (Mo.App. 1992).

■ The circuit court also did not abuse its discretion in overruling defense counsel's other objections to the state's rebuttal argument because the comments were reasonable inferences from the evidence. "Attorneys are allowed substantial latitude in closing argument, and may suggest reasonable inferences for the jury to draw from the evidence." *State v. Francis*, 60 S.W.3d 662, 672 (Mo.App.2001). The prosecutor merely presented to the jury possible motives that may have been what prompted Buchli to kill Armitage. From the evidence, the jury reasonably could have inferred that Buchli misrepresented his income. The prosecutor simply argued that "something happened" to make Buchli "go out and make a decision to take ... Armitage's life." Buchli's contention is without merit.

### Motion to Suppress

■ In his next point, Buchli asserts that the circuit court erred in denying his motion to suppress and in admitting into evidence financial documents recovered during a search of Buchli's house. Buchli contends that the search was unconstitutional because police did not have probable cause to search for the documents, because the application for the search warrant was not sufficiently particular as to those documents, and because police did not file a proper return.

■ Our review of a circuit court's ruling on a motion to suppress is limited to determining whether or not the evidence was sufficient to support the circuit court's ruling. *State v. Burkhardt*, 795 S.W.2d 399, 404 (Mo. banc 1990). We consider the facts in a light favorable to the circuit court's denial of the motion to suppress. *State v. Blankenship*, 830 S.W.2d 1, 14 (Mo. banc 1992). We disregard any evidence contrary to the court's decision. *State v. Hutchinson*, 796 S.W.2d 100, 104 (Mo.App.1990). We will reverse the circuit court's ruling only if we find it was clearly erroneous. *State v. Taber*, 73 S.W.3d 699, 703 (Mo.App.2002).

■ The Fourth Amendment to the United States Constitution guarantees that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." [8] Probable cause is "determined from the four corners of the application of the search warrant and any supporting affidavits." *State v. Willis*, 97 S.W.3d 548, 554 (Mo.App.2003). Whether or not probable cause exists in a particular case is a question of fact. *State v. Berry*, 801 S.W.2d 64, 66 (Mo. banc 1990). Our review, therefore, is not *de novo*, and we give "great deference on review to the initial judicial determination of probable

---

8. Mo. CONST. art. I, § 15 (1945), provides identical guarantees. See also § 542.276, RSMo 2000.

cause made at the time of the issuance of the warrant and we reverse only if that determination is clearly erroneous." *Id.*

 "The test for determining whether probable cause has been established for the issuance of a search warrant is the 'totality of the circumstances.'" *State v. Hill,* 854 S.W.2d 814, 817 (Mo.App. 1993) (quoting *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). "'In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Gates,* 462 U.S. at 231, 103 S.Ct. 2317 (citation omitted). Search warrants, therefore, should not be deemed invalid by "interpreting affidavits in a hypertechnical rather than common sense manner." *Hill,* 854 S.W.2d at 818. As such, the issuing magistrate must "make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238, 103 S.Ct. 2317.

In the affidavit and application for a warrant to search Buchli's house for "[t]race evidence, a belt with blood, blood, receipts, documents, and correspondence," Detective Randall Morris said:

> On 05–05–00 at 1518 hours, officers of the Kansas City Police Department were dispatched to 106 W. 14th, Kansas City, Jackson County, Mo. on a reported ambulance call. Upon arrival they found the victim, Richard Armitage, in his office bleeding from the head. The victim was transported to Truman Medical Center where he later died from head trauma.
>
> The victim's business partner, Richard Buchli ... provided [his] clothing for lab examination. The clothing belonging to Buchli had high velocity blood spatter on his pants, shirt and shoes. The blood belonged to the victim.....
>
> ....
>
> After being interviewed on 05–05–00, Mr. Buchli was allowed access to his office. He reentered his office, the crime scene, on that date and according to the "key card" records reentered the office on 05–06–00 at 1015:05 hours and [at] 1029:15 hours on 05–07–00 and has continued to do business at 106 W. 14th. This would allow Mr. Buchli to transfer documents and trace evidence to his residence, along with the belt he was wearing.

The affidavit is clear that Buchli may have taken business documents to his home and that these documents could relate to Armitage's murder. The affidavit supported a finding that finding evidence in Buchli's house was probable.

Buchli asserts, however, that the application and warrant were not particular enough concerning documents to be seized during the search. The warrant listed only "receipts, documents, and correspondence," permitting officers to conduct "an unrestrained search." Assuming, however, that the warrant was defective for lack of particularity, the evidence was admissible nonetheless because officers acted in good faith reliance on the search warrant and did not conduct an unbounded search.

 "[T]he exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *United States v. Leon,* 468 U.S. 897, 916, 104 S.Ct. 3405 (1984). When police act in reasonable reliance on a facially valid search warrant issued by a detached and neutral magistrate, the exclusionary rule will not operate to bar evidence obtained under the search warrant,

even though the warrant may be invalid. *Id.* at 920–21, 104 S.Ct. 3405; *State v. Brown*, 708 S.W.2d 140 (Mo. banc 1986).

Officer Randy Morris testified that during the search he was looking for financial documents, receipts, and correspondence and that police did not seize any items unless the materials related to Buchli's finances. Officer Diane Lutman also testified that the search warrant authorized her to search for evidence pertaining to the homicide, including business documents and correspondence. Applying the good-faith exception to the present facts, the circuit court did not err in admitting the items seized pursuant to the search warrant, even assuming *arguendo* that the warrant was invalid.

Buchli asserts, however, that the good faith exception does not apply in this case because police misled the judge in obtaining the warrant. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). He alleges that the search warrant contained three lies: (1) "[e]xperts at the Regional Crime Lab stated this [blood spatter] could only be on someone within two feet of the victim when the injuries occurred," (2) the belt Buchli was wearing on the date of Armitage's attack was in Buchli's home, and (3) digital photographs taken on the date of the murder show high velocity spatter on Buchli's belt. Even stripping these challenged statements from the affidavit and application for search warrant, the affidavit and application were sufficient to establish probable cause to search. *See State v. Laws*, 801 S.W.2d 68, 71 (Mo. banc 1990).

█ Buchli also contends that the circuit court should have suppressed the evidence because officers did not leave an itemized list of the property seized with him after the warrant was executed and did not file a proper return. A return to a search warrant, however, is a ministerial act, and even the total failure to file a return does not affect a warrant's validity. *State v. Hunt*, 454 S.W.2d 555, 559–60(Mo.), *cert. denied*, 400 U.S. 942, 91 S.Ct. 239, 27 L.Ed.2d 245 (1970); *State v. Elliott*, 845 S.W.2d 115, 120 (Mo.App.1993). Buchli's contention is without merit.

### Motion to Dismiss—Breach of Contract, Speedy Trial and Pre–Indictment Delay

█ In his next point, Buchli asserts that the circuit court erred in denying his motions to dismiss with prejudice because the prosecuting attorney acted in breach of contract, violated his Sixth Amendment right to a speedy trial, and violated his Fifth Amendment right by the pre-indictment delay. We disagree.

On May 30, 2000, the prosecutor filed an information charging Buchli with murder in the second degree and armed criminal action. The next day, Buchli filed a request for a speedy trial pursuant to § 545.780, RSMo 2000. On June 8, 2000, the prosecutor and Buchli agreed to a special trial setting of October 30, 2000. On October 30, 2000, the parties appeared before the court and jointly requested a continuance of the special trial setting. Buchli's attorney noted on the record that Buchli was waiving his right to a speedy trial and said, "The only thing I could ask is that whatever date we set it for with the experts that that would be the date that we would go." The court granted the continuance and set the case for a special trial setting on April 16, 2001.

On March 20, 2001, the prosecutor applied for a continuance, and the parties appeared before the court on this matter two days later. The circuit court indicated that it would not grant a continuance and that, if the state was not ready to proceed, it should dismiss the case. In anticipation

of the prosecutor's seeking to dismiss the case without prejudice, Buchli filed a motion to dismiss the case with prejudice on March 23, 2001. Buchli asserted that any dismissal by the prosecutor would be made in an effort to obtain a *de facto* continuance and to thwart Buchli's right to a speedy trial, which he had waived in exchange for the special trial setting on April 16, 2001. On March 29, 2001, the prosecutor filed a motion to dismiss the case, noting that the case would be re-filed.

On January 23, 2002, the prosecutor charged Buchli by indictment with murder in the first degree and armed criminal action. Buchli reasserted his right to a speedy trial on January 24, 2002. On February 11, 2002, Buchli filed a motion to dismiss, alleging breach of contract, a violation of his right to a speedy trial, and a violation of his right to due process because of pre-indictment delay. The circuit court overruled Buchli's motion on June 6, 2002, and the case proceeded to trial on July 15, 2002. On appeal, Buchli asserts the circuit court should have granted his motion to dismiss with prejudice.

■ First, Buchli asserts that the state breached an agreement it had with him to go to trial on April 16, 2001. He contends that, when the parties agreed on a special setting date after his speedy trial waiver, the prosecutor waived her right to dismiss the case without prejudice. We disagree. The parties' agreement was as to a trial date only. A *nolle prosequi* is a prosecutor's formal entry on the record indicating that he or she will no longer prosecute a pending criminal charge. It results in a dismissal without prejudice unless jeopardy attaches to bar subsequent prosecution. *Jones v. State*, 771 S.W.2d 349, 351 (Mo.App.1989). "[A] prosecutor has broad discretion to determine when, if, and how criminal laws are to be enforced, and ... this decision is seldom subject to

judicial review." *State v. Honeycutt*, 96 S.W.3d 85, 89 (Mo. banc 2003) (citation omitted). Contrary to Buchli's assertion, the state did not enter into an agreement with Buchli to give up its right to enter a *nolle prosequi.*

■ Second, Buchli contends that his Sixth Amendment right to a speedy trial was violated. In deciding whether a defendant has been denied his constitutionally-guaranteed right to a speedy trial, Missouri courts have adopted the four-prong balancing test set forth in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). *State v. Owsley*, 959 S.W.2d 789, 793 (Mo. banc), *cert. denied*, 959 S.W.2d 789 (1997). "The factors include the '[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant.'" *Id.* (quoting *Barker*, 407 U.S. at 530, 92 S.Ct. 2182).

■ The state filed the charges in the current case on January 23, 2002, and Buchli went to trial on July 15, 2002. This delay was less than six months. It was, therefore, not presumptively prejudicial. *State v. Williams*, 120 S.W.3d 294, 300 (Mo.App.2003). "Until there is some delay that is presumptively prejudicial, we need not inquire into the other three factors used to determine if the defendant has been deprived of his right to a speedy trial." *Id.*

■ Buchli contends that we should consider the 10 months that the charges were pending in the first action in calculating whether the delay was presumptively prejudicial. In the first action, however, Buchli waived his right to a speedy trial, and jointly requested a continuance with the prosecutor for a special trial setting of April 16, 2001. Buchli, therefore, agreed to the delay, and such delay does not count in calculating whether the delay was pre-

sumptively prejudicial. "[T]he delay attributable to the defendant's continuances, motion or other actions must be first subtracted from the total delay." *State v. Davis,* 903 S.W.2d 930, 936 (Mo.App.1995). Moreover, to the extent that Buchli complains about the prosecutor's voluntary dismissal of the charges, the period between the voluntary dismissal of the charges and their re-filing does not count in determining Sixth Amendment speedy trial violations. *State v. Anderson,* 687 S.W.2d 643, 647 (Mo.App.1985); *United States v. MacDonald,* 456 U.S. 1, 8, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982).

▬▬▬ Third, Buchli asserts that the pre-indictment delay required dismissal of the charges with prejudice. "[T]he test for determining whether pre-indictment delay requires the dismissal of charges is whether (1) the defendant was prejudiced by a pre-indictment delay which (2) was intended by the prosecution to gain a tactical advantage over the defendant." *State v. Griffin,* 848 S.W.2d 464, 467 (Mo. banc 1993). The defendant must show that the delay caused substantial prejudice to his right to a fair trial. *Dillard v. State,* 931 S.W.2d 157, 163 (Mo.App.1996). Pre-indictment delay is prejudicial if it impairs the defendant's ability to defend himself. *State v. Clark,* 859 S.W.2d 782, 786 (Mo. App.1993). " 'The prejudice shown must be more than the real possibility of prejudice inherent in any extended delay; that memories will dim, witnesses will become inaccessible, and evidence will be lost.' " A defendant must do more than speculate; he must indicate the nature of possible evidence which could be adduced. *Id.* (quoting *United States v. Marion,* 404 U.S.

307, 326, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)).

Buchli asserts that he was prejudiced because his ability to provide for himself economically was substantially impaired. Buchli, however, does not explain how this hampered his defense. He further claims that he was prejudiced because the state did not preserve the crime scene and because the crime scene was "obliterated by the remodeling of the building." In particular, he complains about the alteration and cleaning of the carpeting. The cleaning company, however, attempted to clean carpeting the day after the murder. Failure to preserve the carpet as evidence was not a result of any pre-indictment delay.

Buchli also alleges that "possibly exculpatory [I]nternet service provider records were destroyed in the time between the dismissal of the first case and the filing of the second case." Buchli contends that the records could have shown the exact time of the attack by showing when Armitage last used his computer.[9] Buchli claims that he was deprived of the opportunity to discover this information because the first mention of Armitage's being online when he was attacked was during the prosecutor's closing argument. This claim, however, is too speculative to constitute the "substantial prejudice" which must be shown to demonstrate a violation of Buchli's right to a fair trial and justify a dismissal.

### Vindictive Prosecution

▬▬▬ In his next point, Buchli contends that the circuit court abused its discretion in denying his motion to dismiss for vindictive prosecution. In the first filing of the charges, the prosecuting attorney charged

---

9. Sound.net, Armitage's Internet service provider, allegedly used an automatic log-off timer to disconnect a user from the Internet exactly 30 minutes from his or her last keystroke or mouse click. Sound.net destroyed its records as a matter of course around January 1, 2002.

Buchli with murder in the second degree. After entering its *nolle prosequi*, the prosecuting attorney re-filed and charged Buchli with murder in the first degree. Buchli asserts that the prosecutor failed to rebut the presumption of vindictiveness after the charges were increased. We disagree.

■■■■■ "To prove an allegation of prosecutorial vindictiveness, a defendant must show that the additional charges were brought solely to penalize him for exercising his constitutional rights and cannot be justified as a proper exercise of prosecutorial discretion." *State v. Miller*, 981 S.W.2d 623, 629 (Mo.App.1998). "The test for prosecutorial vindictiveness is whether the facts show a realistic likelihood of vindictiveness in the prosecutor's augmentation of charges." *State v. Gardner*, 8 S.W.3d at 70. In making such determination, the courts consider two factors: "(1) the prosecutor's stake in deterring the exercise of some right, and (2) the prosecutor's conduct." *Id.* The defendant bears the burden of showing that a realistic likelihood of vindictiveness exists. *State v. Juarez*, 26 S.W.3d 346, 354 (Mo.App.2000). "Only if this is shown does the burden shift to the prosecutor to show, by objective on-the-record explanations, the rationale for the [s]tate's actions." *Id.*

■■■■ Buchli did not meet his burden of showing that the prosecutor enhanced the charge solely to penalize him for exercising his constitutional rights.[10] Buchli points to two constitutional rights he as-

serted which he claims led to the prosecution's enhancement of the charge: his motion to suppress the evidence obtained from his residence and his motion to dismiss for violation of his right to a speedy trial. The pretrial exercise of a procedural right, such as the routine filing of a pretrial motion to suppress evidence, however, does not raise a presumption of prosecutorial vindictiveness. *United States v. Goodwin*, 457 U.S. 368, 381, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982). "It is unrealistic to assume that a prosecutor's probable response to such motion[ ] is to seek to penalize and to deter." *Id.* Moreover, Buchli also waived his right to a speedy trial by agreeing to a continuance to a special setting for trial. Because Buchli did not meet his burden of showing that a realistic likelihood of vindictiveness exists, the state did not have to come forward with objective evidence justifying the prosecutorial action.

## Cumulative Error

■■■ In his final point, Buchli contends that the circuit court abused its discretion by not dismissing the case or by not granting him a new trial because the cumulative effect of all the previously alleged errors prejudiced him. The Supreme Court has rejected this point: " 'Numerous non-errors cannot add up to error.' Having determined that none of defendant's previous points amount to reversible error, there can be no reversible error attributable to their cumulative effect." *State v. Gray*,

---

**10.** Buchli contends that this case is analogous to *State v. Quimby*, 716 S.W.2d 327 (Mo.App. 1986), in which the prosecutor informed the defendant that, if he requested a jury trial, the prosecutor would dismiss the misdemeanor charge and re-file it as a felony. Id. at 328. The Quimby court concluded no factual basis existed "on which it could be contended by the state that the felony charge was filed for any reason other than in retaliation for the

request by appellant for a jury trial." Id. at 330. The court found that the defendant was entitled to a jury trial on the original charge "without fear that an attempt to exercise that right would expose him to the risk of a substantially increased punishment." Id. at 331. In this case, the prosecutor made no such threat to deter Buchli from filing a motion to suppress or from asserting his right to a speedy trial.

887 S.W.2d 369, 390 (Mo. banc 1994), *cert. denied,* 514 U.S. 1042, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995) (citation omitted); *State v. Gardner,* 8 S.W.3d at 74.

### Conclusion

We affirm the circuit court's judgment convicting Buchli of murder in the first degree and armed criminal action.

EDWIN H. SMITH, Chief Judge, and HAROLD L. LOWENSTEIN, Judge, concur.