

# In the Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Respondent, | ) | WD84274 |
| v. | ) | |
| | ) | |
| JEFFERY JEROME MILLENS, JR., | ) | FILED: May 17, 2022 |
| Appellant. | ) | |

## APPEAL FROM THE CIRCUIT COURT OF COLE COUNTY
### THE HONORABLE DANIEL R. GREEN, JUDGE

### BEFORE DIVISION ONE: LISA WHITE HARDWICK, PRESIDING JUDGE,
### ALOK AHUJA AND MARK D. PFEIFFER, JUDGES

Jeffery Millens appeals from his convictions of second-degree murder, armed criminal action, and the unlawful possession of a firearm. Millens contends there was insufficient evidence to support his convictions. He further argues the circuit court erred in granting the State's motion to quash a post-trial subpoena duces tecum for a juror who allegedly committed misconduct. Lastly, he asserts the court erred in entering a written sentence for second-degree murder that differs from the court's pronounced sentence. For reasons explained herein, we affirm, conditioned upon a limited remand with instructions to correct the written judgment to reflect the actual sentence imposed.

**FACTUAL AND PROCEDURAL HISTORY**

In the light most favorable to the verdict, the following facts were adduced at trial: On December 31, 2016, Millens attended a party at Georden Qualls's home. At the time, Millens was wearing a red coat and had shoulder length dreadlocks. The home was sparsely lit. At some point, Qualls observed Quonterio Davis fighting with a man who appeared to have dreadlocks and was wearing a red coat. Qualls further testified that, "when the fight broke out," he heard someone say Millens's name. Qualls saw a gun "as much as he wanted to see it," and heard gunshots, which caused Qualls to flee to another room.

Dimitri Barnes, who was in a relationship with Davis and who shared a child with Millens, was in a separate room when the shooting occurred. After the shooting stopped, Kristen Andrews, Millens's cousin, warned Barnes to hide because "it's Jeff [Millens]." Barnes assumed that Andrews had warned her to hide because she and Millens had been on bad terms since the birth of their child.

Andrews was also in another room when she heard arguing and heard Millens say "bitch," which prompted her to run towards the argument. As she reached an entrance to the room where the fight was happening, she saw muzzle flashes and heard gunshots. In the confusion, she collided with another party guest. After Andrews reoriented herself, she saw Millens with his arms raised standing near Davis, who was on the floor "gasping for air." Millens looked at Andrews but said nothing, and "[Millens] left, but he didn't run. He didn't – he just looked at [Andrews]."

2

Andrews informed officers that Millens was the shooter, and officers arrested Millens later that night. Millens initially told detectives that he was at his girlfriend's house and had a flat tire, but he eventually admitted that he attended the party. He further denied knowing Davis, which he also later recanted. Officers attempted to perform a test to determine if gunshot residue was present on Millens, but he resisted. The test was eventually performed, and the results showed elements consistent with gunshot residue. One of Millens's dreadlocks had also fallen off and was recovered in the room where the shooting occurred.

Millens was charged with second-degree murder, armed criminal action, and illegal use of a firearm. A jury trial was held. During voir dire, Millens's trial counsel asked if any potential jurors had previously known Millens. Juror number 23 remained silent. After trial, Millens filed a motion for a new trial in which he argued, in part, that juror number 23 committed misconduct by failing to disclose that she knew Millens. Millens's motion contained only general allegations that juror number 23 knew him and that he did not recognize her sooner because she wore a mask in the courtroom. Millens issued a subpoena duces tecum to summon juror number 23 to testify. The State filed a motion to quash the subpoena on the ground that Millens had not alleged facts indicating that the juror actually knew him. At sentencing, Millens's counsel argued that, "[a]fter the trial was concluded, Mr. Millens advised my office that he recognized juror No. 23 and realized that she had been living across the street from him and his mother at one point." The circuit court granted the State's motion to quash the subpoena duces

tecum, denied Millens's motion for new trial, and sentenced Millens to consecutive sentences of life imprisonment for second-degree murder, and 10 years each for armed criminal action and the unlawful use of a firearm. Millens appeals.

## ANALYSIS

In Points I and II, Millens contends the verdict was unsupported by sufficient evidence that he shot Davis and that he ever shot a firearm. Our review of a challenge to the sufficiency of the evidence to support a conviction is "limited to determining whether there was sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Naylor*, 510 S.W.3d 855, 859 (Mo. banc 2017) (internal citation and quotations omitted). "This is not an assessment of whether this [c]ourt believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal citations and quotations omitted). We do not reweigh the evidence but, instead, accept as true all evidence and inferences supporting guilt and ignore all contrary evidence and inferences. *Id.* at 858-59.

Millens contends the jury's verdict rests on "unreasonable inference and speculation." He argues the State's witnesses all saw the events surrounding the shooting, but that none could testify that they unequivocally saw him shoot Davis. To support his argument, Millens relies on *State v. Lehman*, 617 S.W.3d 843, 849

4

(Mo. banc 2021), a case in which our Supreme Court reversed a conviction based on insufficient evidence. In *Lehman*, the defendant was charged with loitering within 500 feet of a public park after having been convicted of incest in another State. *Id*. at 844-45. The only piece of evidence indicating that the defendant was within 500 feet of a public park was a police report indicating that the defendant was at a location "near" a park. *Id*. at 845. The Court found that the term "near," without support from additional evidence, was too subjective to prove beyond a reasonable doubt that the defendant was within 500 feet of a public park. *Id*. at 849-50.

Millens argues the circumstances of his case are similar to those in *Lehman* because the State's evidence merely places him near the shooting, which he contends is insufficient to support the verdict. We disagree. Unlike in *Lehman*, where a single, ambiguous article of evidence was offered to demonstrate the defendant's proximity to the park, the State in this case offered ample evidence that not only indicates that Millens was near the shooting but also allows for the reasonable inference that he was, in fact, the shooter.

Qualls testified that he saw someone matching Millens's description fighting with Davis immediately before the shooting occurred and that someone said Millens's name as the fight broke out. Qualls saw a gun and heard the gunshots that resulted in Davis's death. Qualls's testimony allows for the reasonable inference that Millens was fighting with, and ultimately shot, Davis. Andrews's testimony and statements to police allow for a similar inference.

5

Andrews testified that she heard arguing and that she heard Millens say "bitch" from that area, which allows for the reasonable inference that Millens was involved in the argument. Andrews also testified that she ran into the room during the shooting to see Millens standing with his arms raised near the recently shot Davis. Andrews selected Millens from a photographic lineup as the man standing near Davis with his arm raised.

Additionally, Millens had gunshot residue on his person, allowing for the reasonable inference that he recently shot a firearm, and he had lost a dreadlock in the room where the shooting occurred, indicating his immediate proximity to the shooting. Millens's own conduct after the shooting further supports an inference of guilt as he walked, rather than ran, away from an active shooting, resisted when officers sought to obtain a gunshot residue sample, and he admitted to lying to detectives about his whereabouts that evening. Millens's lack of alarm to the shooting allows for an inference that he was not alarmed because he was the shooter, and his attempt to hide his whereabouts infers a guilty conscience. *See State v. Buchli*, 152 S.W.3d 289, 297 (Mo. App. 2004) ("Guilt may be inferred when an accused attempts to deceive the police, as in making a false exculpatory statement").

Millens argues at length about the unreasonableness of the inferences drawn from the evidence. In doing so, he asks us to depart from our standard of review and consider adverse evidence and inferences that do not support the verdict. Millens argues that multiple people at the party had dreadlocks and red

6

coats, so any witness identification on those grounds is ineffectual; that Andrews was intoxicated during the party, impeaching her credibility; that, at trial, Andrews recanted her prior identification of him as the shooter; that his lying to detectives about his whereabouts was "understandable" because he was scared; and that the sum of the evidence merely demonstrates that he was "a bystander to the fight." These arguments rely on either evidence or inferences adverse to the verdict, which we may not consider, or they run contrary to the jury's credibility determinations, which we will not disturb on appeal. *Naylor*, 510 S.W.3d at 858-59. Without more, and without departing from the appropriate standard of review, Millens has neither rebutted the evidence nor the multiple reasonable inferences drawn therefrom that he shot Davis with a firearm. We find that the evidence was sufficient to support the jury's verdict beyond a reasonable doubt. Points I and II are denied.

In Point III, Millens contends the circuit court abused its discretion in granting the State's motion to quash Millens's subpoena duces tecum for juror number 23 and denying his motion for new trial based on juror misconduct. "A trial court's evidentiary rulings are reviewed for abuse of discretion." *State v. Davis*, 318 S.W.3d 618, 630 (Mo. banc 2010); *State ex rel. Poker v. Kramer*, 216 S.W.3d 670, 672 (Mo. banc 2007) (applying the abuse of discretion standard to the denial of a motion to quash a subpoena duces tecum). "The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before it and when the ruling is so arbitrary and unreasonable as to shock our sense of

7

justice and indicate a lack of careful consideration.  *State v. Garvey*, 328 S.W.3d 408, 417 (Mo. App. 2010).

Millens argues that, because the court quashed his subpoena, he was unable to present evidence supporting his claim of juror misconduct and was thereby deprived of the opportunity to prove his allegation.  Millens supports his argument that his subpoena should have been enforced with the conclusory assertion that:

> Because Mr. Millens raised the issue of juror misconduct in his timely motion for a new trial, and because Mr. Millens subpoenaed Juror No. 23 to testify at the hearing on his motion for a new trial, the court abused its discretion in quashing the subpoena and denying the motion for a new trial.

"Rule 26.02 vests the trial court with broad discretion in determining whether good cause exists for the enforcement of a subpoena duces tecum." *State ex rel. St. Louis Cty. v. Block*, 622 S.W.2d 367, 369 (Mo. App. 1981).  The party seeking enforcement bears the burden to show good cause. *See id*.; *State ex rel. Phelps v. McQueen*, 296 S.W.2d 85, 89 (Mo. banc 1956).  Although Millens did generally allege in his motion for new trial that juror number 23 knew him, those allegations did not include any factual allegations indicating when, where, or how juror number 23 knew him.  Indeed, Millens's motion did not contain any factual allegations beyond that he recognized juror number 23 after the trial had ended.  Millens did not allege how he knew juror number 23, or that she had any reason to know him.  What caused him to realize post-trial that he knew juror number 23?

8

In arguing against the motion to quash at sentencing, Millens's counsel further asserted that Millens recognized that juror number 23 had lived near him and his mother "at one point." In response, the State argued that Millens failed to allege sufficient facts indicating that juror number 23 actually knew him. After hearing the arguments, the court granted the motion to quash.

Millens does not support his sparse allegations of juror misconduct with relevant caselaw or additional facts in the record; rather, he argues at length that, assuming his subpoena was enforceable, his inability to call juror number 23 to testify caused the circuit court to inappropriately deny his motion for new trial without hearing any evidence. This argument does not remedy the lack of good cause shown to enforce the subpoena, and it ignores that Millens or his mother, if available, could have testified to their relationship with juror number 23, or Millens could have deposed juror number 23 prior to the hearing. The argument also ignores that Millens could have included far greater allegations of fact from his own experience of allegedly knowing juror number 23 to show why the subpoena should be enforced. With only a single, vague factual allegation supporting an inference that juror number 23 knew Millens for the court to consider, we find that the court did not abuse its discretion in granting the State's motion to quash the subpoena. Moreover, because Millens subsequently failed to produce any evidence to support his contention of juror misconduct, the court did not abuse its discretion in denying his motion for new trial on this basis. Point III is denied.

9

In Point IV, Millens contends that the circuit court committed a clerical error in its written sentence that requires correction. At sentencing, the circuit court pronounced that Millens was to be sentenced to life imprisonment for second-degree murder. The circuit court's written judgment, however, imposes a sentence of "999 Years." The parties agree that the oral pronouncement controls under these circumstances and that the judgment does not accurately reflect the actual sentence imposed. *See Johnson v. State*, 446 S.W.3d 274, 276 (Mo. App. 2014). The parties further agree that the appropriate remedy is an order *nunc pro tunc* under Rule 29.12(c) to correct the error in the judgment. *State v. Bjorgo*, 571 S.W.3d 651, 660-61 (Mo. App. 2019) (where we issued a "limited remand" with instructions for the circuit court to correct its judgment to reflect the sentence actually imposed). Rule 29.12(c) proscribes, "Clerical mistakes in judgments, orders or other parts of the record and errors in the record arising from oversight or omission may be corrected by the court at any time after such notice, if any, as the court orders."

The sole disagreement between the parties is the appropriate procedure for correcting the judgment. The State argues that we need not issue a limited remand and that we may correct the judgment ourselves under Rule 84.14, a procedure that we utilized in *Pittman v. State*, 331 S.W.3d 361, 368 n*2 (Mo. App. 2011). In *Pittman*, however, we noted that the "unusual" decision to amend the judgment under Rule 84.14 was made in light of the case's unique procedural

10

circumstances, which are not present here.[1]  *Id.*  Accordingly, we find a limited remand for the purpose of correcting the written sentence appropriate under the circumstances in this case.  *See Bjorgo*, 571 S.W.3d at 660-61.  Point IV is granted.

CONCLUSION

The judgment is affirmed; however, we issue a limited remand with directions that the circuit court enter an order *nunc pro tunc* correcting the written sentence and judgment with respect to Millens's conviction for second-degree murder to reflect a sentence of life imprisonment rather than "999 Years."

LISA WHITE HARDWICK, JUDGE

ALL CONCUR.

---

[1] The appeal in *Pittman* arose from the denial of a Rule 24.035 post-conviction motion in which the defendant requested that the circuit court issue an order *pro nunc tunc* to correct his sentence. *Pittman*,  331 S.W.3d at 368 n*2.  The defendant's request was ultimately abandoned by his post-conviction counsel, however, so the circuit court did not consider it. *Id.*  On appeal, we found no error in the circuit court's failure to issue an order *nunc pro tunc*, and expressed concern that our affirmation of the circuit court's denial of the Rule 24.035 motion would amount to a final adjudication of the request to correct the sentence, which may have then precluded the defendant from obtaining relief under Rule 29.12. *Id.*  Here, Millens directly appeals his sentence, and thus avoids the procedural uncertainties present in *Pittman*.  Under similar procedural circumstances to the case before us, we have found a limited remand to be the appropriate remedy. *See Bjorgo*, 571 S.W.3d at 660-61.